# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DeWAYNE BRITZ, Appellant.

*Opinion filed July 20, 1988.—Rehearing denied October 3, 1988.*

STAMOS, J., took no part.

Charles M. Schiedel, Deputy Defender, and James E. Chadd, Assistant Defender, of the Office of the State

Appellate Defender, of Springfield, and John McCarron and Karen McNaught, law students, for appellant.

Neil F. Hartigan, Attorney General, and Donald M. Cadagin, State's Attorney, both of Springfield (Kenneth R. Boyle, Patrick Delfino, Robert J. Biderman and Denise M. Ambrose, of the State's Attorneys Appellate Prosecutor, of counsel), for the People.

JUSTICE CUNNINGHAM delivered the opinion of the court:

On February 14, 1985, defendant, DeWayne Britz, was charged by information in Sangamon County with six counts of murder (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3)), one count of aggravated kidnapping (Ill. Rev. Stat. 1985, ch. 38, par. 10—2(a)(5)), two counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(a)(1)), one count of armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 18—2(a)), and one count of concealment of a homicidal death (Ill. Rev. Stat. 1985, ch. 38, par. 9—3.1(a)). These charges involved the murder, kidnapping, robbery and rape of Mimi C. Covert on January 16, 1985.

Defendant was also charged with armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 18—2(a)) and theft (Ill. Rev. Stat. 1985, ch. 38, par. 16—1(a)(1)) of Paul Tackett of Tackett Wheels, Inc., on January 16, 1985, in that defendant took Tackett's truck by use of force—a gun.

Following a jury trial, defendant was found guilty on all counts. Pursuant to section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1) (hereinafter referred to as the death penalty statute), a death penalty hearing was held before the same jury (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(d)(1)). The jury unanimously found that defendant had attained the age of 18 or more, that statutory aggravating factors exist and that

no mitigating factors exist to preclude the imposition of the death sentence. Defendant was sentenced to death on all six counts of murder. The sentence was stayed (107 Ill. 2d R. 609(a)) pending appeal to this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603).

The evidence adduced at the trial revealed the following sequence of events. On January 16, 1985, between the hours of 10 a.m. and 6:15 p.m., defendant spent the day at Tackett Wheels, Inc., a used car dealership in Springfield. Defendant, who had worked at Tackett Wheels until he was fired in November 1984, was "hanging out" and helping clean snow off the cars in the lot. During the course of the day defendant saw Paul Tackett, owner of Tackett Wheels, Inc., make a cash sale. By 6:15 p.m., everyone had gone home except defendant and Tackett. At that time Tackett began to put something into a file cabinet when defendant hit him in the back of the head with a pistol. Defendant was looking for the money from the cash sale. After Tackett turned around and asked defendant what he was doing, Tackett ran out of the building toward a tavern across the street. He then saw defendant get into his (Tackett's) 1972 Chevrolet pickup truck and drive away. The keys were in the truck and the engine was running because Tackett was warming it up.

Defendant left in the truck, traveling north out of Springfield through several small towns. He eventually stopped at a tavern in Salisbury and had a beer. After he left the Salisbury tavern, defendant began to travel southbound toward Springfield. When defendant noticed that the truck was low on gas, he turned around and headed north. As he was driving, he observed that the truck was overheating. He then stopped the truck and put on his emergency flasher signal.

A few minutes later, the victim, Mimi C. Covert, pulled up in her orange Honda with California license

plates and offered defendant a ride into Petersburg. After defendant entered Covert's car and they proceeded to Petersburg, defendant pulled a gun on her and ordered her to take him to Springfield. During that period, he took five number 10 valium tablets and $5 or $6 from her purse and demanded that she withdraw additional money from an Easy Answer automatic teller machine. They tried Covert's Easy Answer Card in machines at three different locations but all were out of service. He then told her to drive toward the airport.

As they traveled along the perimeter roads of Capitol Airport, defendant asked her if she felt like "having sex." Defendant stated that she agreed and subsequently performed fellatio and engaged in vaginal sexual intercourse in the backseat of the car. Defendant stated that the gun was on the front seat of the car in his pants pocket. Afterwards, defendant took control of the car and continued driving north along the same road. Since the roads were covered with ice and snow, defendant slowed down and shifted gears so he could negotiate a curve. At that moment, Covert jumped from the car and ran. Defendant stopped the car, got out and fired a shot in her direction. Defendant saw Covert grab the side of her head and fall to the ground as blood spurted from her head. As he approached her, she yelled out that she was already dead. Nonetheless, defendant shot her with the remaining bullets in the chamber and reloaded the gun. Defendant then disposed of her body in a ditch across the road. When defendant noticed that Covert's body kept quivering, he emptied the new chamber into her body and subsequently covered her with snow.

After leaving the area, defendant stopped at a package liquor store and purchased a 12-pack of Busch beer and a half-pint of Jack Daniels whiskey. Eventually, he checked into room 4 of the Haven Motel. Defendant

threw Covert's fishing license in the trash can in the room, hid the car keys to Covert's car and fell asleep.

Through several leads and dispatches, the police discovered the victim's car at the motel and traced the car to defendant in room 4. After they questioned defendant, the officers placed him under arrest, read him his *Miranda* rights, and searched defendant and the room. In the room they found the victim's fishing license and keys to her car. On defendant, the officers found a revolver loaded and ready to fire.

Since defendant raises numerous issues regarding various stages of the trial proceedings, this court will consider those additional facts in full as we consider each issue. The record is voluminous and this court does not find it necessary to repeat the facts.

I

Defendant's first issue on appeal is whether or not the circuit court erred when it disallowed defendant's expert witnesses from testifying on the issue of defendant's temporary insanity at the time of the offense. Defendant argues that the expert witnesses would have testified to defendant's long-standing mental disease or defect predicated upon his voluntary ingestion of alcohol or drugs.

At the trial, nine witnesses testified regarding defendant's alleged intoxication from alcohol or drugs on the night of the incident. In light of these witnesses, the evidence adduced at trial does not support any possibility that defendant was under the influence of any alcohol or drugs.

Although Paul Tackett, defendant's former employer, left the business premises two or three times that day, he saw defendant consume one L.A. Busch beer and nothing else. Tackett stated at the trial that based on his observation of defendant, defendant was not under the

influence of any alcohol or narcotics. He further stated that defendant appeared to be acting normally.

Detective Michael Maybury, the officer who arrived at the motel as Officers Tony Sacco and Tom Hendrickson were entering defendant's motel room, stated that based on his 20-minute to half-hour observation of defendant, and his 13 years of law enforcement experience, defendant was not intoxicated. During that time he was within six to seven feet of defendant.

Peggy Elliott, manager of the Haven Motel for two years, saw defendant on the night of the incident when defendant registered for a room. During the 5 to 10 minutes Elliott observed defendant, she was within 18 inches, separated only by a thin screen in front of her desk. She did not notice any odor of intoxicating liquor on defendant. She stated that defendant was very polite, his speech was not slurred and he walked normally without any sway, stagger or fall. In her position as a manager, she stated that she continually sees persons who are under the influence of alcohol or drugs. Later that morning, she went into the motel room in which defendant had stayed and found a half-pint of whiskey with very little gone and a 12-pack of beer with only one can missing. The missing can was found on the desk and it was half full. She brought the liquor to the police station.

Patrol sergeant Tony Sacco, a police officer for 15 years, also observed defendant that night. During the time Sacco was at the motel, he had contact with defendant for 45 minutes to an hour, personally spoke with defendant and stood within two feet of defendant. Based on his experience and his observations of defendant, he opined that defendant was not under the influence of any alcohol or drugs. Sacco stated that defendant was very calm, and cooperative. He also observed

that defendant's speech was not slurred and he did not stagger as he walked or sway as he stood.

Deputy sheriff Tom Hendrickson, a law enforcement officer for nine years, observed defendant at the motel and at the police station from 4 a.m. until 11 a.m. He stated that he did not smell any intoxicating liquor on defendant and that defendant did not slur his speech and did not stagger as he walked. Based on his observations and law enforcement experience, Hendrickson opined that defendant was not under the influence of any alcohol or drugs.

Detective Al Sample, over 10 years in the field of law enforcement, was within a foot of defendant during the six hours they were together at the police station. Sample did not detect the odor of any liquor on defendant and observed that defendant appeared to be normal and was able to talk and walk. At the station Sample read defendant his *Miranda* rights again. Subsequently, defendant gave a verbal taped statement in which he stated that he had one beer in Salisbury. Regarding his level of intoxication at the time of the incident, defendant made the following statements to questions by Sample:

"Are you under the influence of alcohol or drugs right now?

Right. Yeah, feel a little influence. I wouldn't say totally, 'cause I had four or five or six hours sleep.

Are you still in control of your actions and aware of what is going on here?

Yes. I am now.

When this happened, were you under the influence of alcohol or drugs?

Both.

Were you still aware of what was happening, in control of your actions?

No, 'cause I could hardly drive, let alone—*it probably was mostly nerves.*

> You were still able to drive the car back to Springfield after this happened. *So, were you totally under the influence of alcohol and drugs?*
>
> *I wouldn't say totally* \* \* \*.
>
> You were still aware of what transpired \* \* \*.
>
> I say I was more shocked at what happened, more or less sobered me up. I don't know how to explain it, but it just—like when the gun first went off, I seen the blood, I just went, I don't know, real crazy, didn't know what to do next. I got real frantic then." (Emphasis added.)

This court finds that these statements alone or in light of the record as a whole do not establish a defense of voluntary intoxication based on a long-standing mental disease. Defendant's statements do not reveal that his loss of control was based on a long-standing chronic illness but rather one night of voluntary intoxication. His statements at this point do not suggest a necessity for expert witnesses' testimony regarding a chronic illness. Nonetheless, defendant called five witnesses regarding his use of alcohol and drugs prior to the incident and the effect of those chemicals on him.

Harvey Byron Lloyd, a driver for Lincoln Yellow Cab, was hired by defendant on January 8, 10, and 11, 1985. However, Lloyd never saw defendant under the influence of any alcohol or drugs. Lloyd stopped working as defendant's chauffeur after defendant fired a gun out of the cab window and drew his gun on a waitress in a bar.

Jacqueline Smith, defendant's half-sister, allowed defendant to live with her from September 1984 to the day of his arrest. She stated that every day defendant drank alcohol heavily and used marijuana. On January 8, 13, and 15, 1985, she noticed that defendant was more active and talkative than usual and "feeling good" after snorting a white powdery substance up his nose. Under cross-examination, she stated that although she knew of defendant's habits, she continued to allow defendant to

baby-sit her children. Furthermore, on the day of the incident, she saw defendant acting normally.

James R. Watts partied and drank beer with defendant on January 15, 1985, and saw defendant snort a white powdery substance up his nose. Also, during that night, while Watts and defendant were driving around in a residential area, defendant pulled out a gun and fired it twice into the air. Watts did not see defendant at any time on the day of the incident.

Dave Whittington, an employee of Tackett Wheels, Inc., saw defendant on the day of the incident at Tackett Wheels, Inc. Whittington stated that defendant appeared normal to him but was "awful" quiet. He did not see defendant consume any alcohol that day. However, about a month before the incident, Whittington received a phone call from defendant requesting him to meet him at a bar. At that time defendant repaid Whittington some money he had borrowed from him and requested him to go to the used car lot and take a certain car. When Whittington refused, defendant pulled a knife on him, threatening to kill him. Defendant on that night looked "very unusual" and acted as if he were drunk or "high."

Randy Durbin, an acquaintance of defendant, stated that he saw defendant a week before the incident. At that time, defendant was more slender and his face was very thin. Durbin was with defendant when defendant shot his gun out a car window while they were "riding around."

Defendant also attempted to present three expert witnesses to raise an insanity defense based upon a chronic disease predicated on the voluntary ingestion of alcohol or drugs. The State had filed a motion *in limine* to prevent the defense's experts from testifying because the reports of the three experts contain self-serving hearsay statements of defendant regarding the type and quantity of alcohol and drugs that defendant consumed

on January 16, 1985. After the hearing the court ruled that the defense experts could only testify to conclusions reached through objective tests and any opinions based on defendant's statements would be inadmissible. When defendant objected, the court allowed an offer of proof.

Dr. Leslie Fyans, a psychologist, examined defendant on several occasions and administered numerous tests. On March 18, May 5, and October 20, 1985, he conducted personal interviews of defendant. During the other visits for examinations, he administered several tests to assess defendant's intelligence, personality and neuropsychological state. The results of the tests revealed that defendant had a verbal IQ score of 82 points and a performance IQ of 76 points on the Weschler Adult Intelligence Scale Revised. The other tests did not reveal any organic or neuropsychological abnormality on the basis of his responses to the Bender Gestalt, Benton Visual Retention Test, the Cattel Culture Fair test and the Raven Progressive Matrices. On the Minnesota Multiphasic Personality Inventory (MMPI), the results—a high F scale—revealed an exaggerated response pattern, indicating invalidity. As Dr. Fyans stated, the high F scale also indicates a potential attempt to "fake bad."

Next, Dr. Fyans recounted defendant's version of the incident and his history of drug and alcohol use. On the day of January 16, defendant told Dr. Fyans that he had drunk a large amount of alcohol. While driving around the north part of the county, defendant took 10 to 12 Libriums, four Valiums, and two hits of acid, and drank seven to eight beers. Defendant also revealed to Dr. Fyans a history of alcohol use dating back to the age of five or six. At that age he was drinking whiskey until he became ill or passed out. When he was older he regularly drank beer. He then began to use speed, angel dust, or PCP, and marijuana in high school. By the age of 19, he added Darvon and other prescription drugs to

his consumption. He even attempted suicide and received drug rehabilitation on different occasions. Later, he began to use Placidyl and then heroin.

After Dr. Fyans heard defendant's history of substance abuse, he concluded that defendant was suffering from substance abuse disorder and a borderline personality disorder. He opined that on the night of the incident, defendant would have been unable to conform his behavior to the constraints of the law. Dr. Fyans did not review police reports and did not read the report of Dr. Thomas Mulry, a licensed physician, or the report of Joan Stockhoff prior to the interviews. Dr. Fyans read the reports only prior to testifying. Moreover, Dr. Fyans did not read the reports, if any, from the drug rehabilitation center where defendant received treatment. He admitted that all of defendant's drug history information was received solely from defendant.

Joan C. Stockhoff, a clinical pharmacist, performed a drug-history interview with defendant. She interviewed him for an hour and a half, at which time defendant related basically the same facts to Stockhoff as he did to Dr. Fyans. Moreover, she received all of defendant's drug history from defendant. She did not review any reports of any kind prior to the interview.

Dr. Thomas Mulry, a licensed physician specializing in chemical dependency, also conducted an interview with defendant. His evaluation was designed to determine whether defendant could be diagnosed as chemically dependent and whether defendant had developed a tolerance that enabled him to ingest enormous amounts of drugs on January 16 and still continue to function. He did review the report of Stockhoff prior to the interview. Dr. Mulry determined that defendant was chemically dependent and an alcoholic. In reaching that conclusion, Dr. Mulry related the following. Dr. Mulry stated that defendant experienced his first alcoholic blackout at the

age of 15. Dr. Mulry also stated that in light of defendant's lack of control, inability to keep a job, past criminal history, and impaired social life, he exhibited symptoms of a chemically dependent person. He opined that defendant had developed a pharmacological tolerance to all drugs except LSD on the night of January 16. Dr. Mulry believed defendant was intoxicated on January 16 and possibly could have had periods of loss of control as well as periods of control.

At the interview with Dr. Mulry, defendant claimed that he had a loss of memory until the first time he fired his gun, a trace memory of seeing the body of the victim lying on the ground and his next memory was leaving the scene. However, Dr. Mulry, at the time of the interview, was unaware of defendant's taped statement to the police giving a detailed description of the events of that night and especially of the events during the time of his alleged memory loss.

At the conclusion of the offer of proof, the court ruled that the opinions of the medical experts who examined or interviewed defendant solely for purposes of testifying were inadmissible if based in material part on defendant's statements regarding his drug and alcohol history and his ingestion of chemicals on the night of January 16, 1985. The court further stated that the experts could not recount defendant's declarations to them. None of the defense's three expert witnesses testified.

In *Wilson v. Clark* (1981), 84 Ill. 2d 186, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140, this court held that it was unnecessary for hospital records to be admitted in order to elicit an expert medical opinion. In doing so, this court adopted Rules 703 and 705 of the Federal Rules of Evidence. (Fed. Rules Evid. 703, 705.) Rule 703 permits an expert witness to give his opinion on the basis of facts which have not been admitted into evidence if they are of a type reasonably relied

upon by experts in the particular field in forming opinions or inferences upon the subject. Rule 703 does not distinguish between a treating and nontreating physician. Rule 705 permits an expert to give an opinion without disclosing the facts underlying that opinion.

Following *Wilson*, this court applied the rule in *People v. Anderson* (1986), 113 Ill. 2d 1, *cert. denied* (1986), 479 U.S. 1012, 93 L. Ed. 2d 713, 107 S. Ct. 658. Although defendant cites *Anderson* for support, it is factually distinguishable from the case at bar.

In *Anderson*, this court held that an expert should be allowed to reveal, on direct examination, the contents of materials upon which he reasonably relied in forming his opinion. The expert may rely on reports compiled by others if the materials are of a kind customarily relied upon by members of the profession. This procedure allows the jury to evaluate the expert testimony. This court held that a psychiatric expert may testify regarding statements made to him by defendant which figure into his professional diagnosis concerning the issue of sanity. It does not matter if the psychiatrist is a treating or nontreating physician.

In *Anderson*, the expert relied on reports by other psychiatrists, doctors and counselors made while the defendant was in the army and while he was incarcerated in California. The expert also relied on reports made by State psychiatric experts and information relating to a previous criminal offense. In addition to those reports, the expert relied on statements made by the defendant to him and letters written by or at the direction of the defendant.

In this case, the defense's experts did not rely on any other reports in assessing defendant's alleged substance abuse disorder. They did not refer, either before or after their examination of defendant, to reports made by the officers, the statements of witnesses, or the reports

from the rehabilitative center or centers in which defendant allegedly received treatment. They did not speak to friends or members of his family. The bases of their opinions rely substantially on the statements of defendant. This court does not believe that *Wilson v. Clark* in combination with *People v. Anderson* allows for such an extension of the rule. To allow an expert to rely solely on self-serving statements made by the defendant to determine his sanity defense permits this court to circumvent and abrogate the intent and meaning of the Federal Rules of Evidence and the rules announced in *Wilson* and *Anderson*. If this court were to allow such testimony, it would open the door for a defendant to tell his side of the story without the possibility of being cross-examined.

In another recent case, *Melecosky v. McCarthy Brothers Co.* (1986), 115 Ill. 2d 209, this court followed the holdings in *Wilson* and *Anderson*. This court allowed the testimony of the plaintiff's expert witness, a nontreating physician. Unlike this case, the expert based part of his opinion not only on the plaintiff's subjective statements but also on the medical history as recorded by the plaintiff's previous physicians and his own tests. In this case, the experts relied substantially, if not totally, on defendant's self-serving statements regarding his alleged substance abuse disorder.

Furthermore, defendant's statements fail to establish any chronic substance abuse disorder in light of the facts before the court. The evidence reveals that if defendant had taken any drugs or alcohol he did so voluntarily and not because of a permanent or fixed mental disorder.

Based on this court's holding in *People v. Free* (1983), 94 Ill. 2d 378, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 175, 104 S. Ct. ?00, defendant is precluded from raising a defense based on voluntary intoxication. In *Free*, the defendant's three expert witnesses concluded

that the defendant was suffering from a mental disease, toxic psychosis, secondary to some sort of chemical or drug intoxication, and as such the defendant could not appreciate the criminality of his acts or conform his conduct to the requirements of the law. This court held that "toxic psychosis induced by voluntary intoxication on drugs, alcohol or both is not a 'mental disease or mental defect' which amounts to legal insanity under our statute." (94 Ill. 2d at 406.) This court held that the voluntary intoxication or drugged condition precludes the use of the insanity defense except where the mental disease or defect is traceable to the habitual or chronic use of drugs and alcohol and results in a permanent type of insanity. (94 Ill. 2d at 408.) In this case, there was no evidence of a chronic or permanent type of mental disease attributable to chronic substance abuse of alcohol and/or drugs except in the statements of defendant to his expert witnesses. Thus this court finds that the circuit court did not err.

## II

Defendant's second issue on appeal is whether or not he was denied a trial by a fair and impartial jury. Defendant specifically contends that the court erred when it refused to excuse for cause prospective jurors who had read and remembered a newspaper article concerning the incident. In some cases the veniremen formed opinions regarding defendant's case. Defendant alleges that the article which appeared two days before jury selection commenced was so prejudicial that it affected his right to a fair trial before an impartial jury.

After the court granted defendant's motion for change of venue on account of pretrial publicity in Sangamon County, the case was transferred to Champaign County. Prior to the jury selection, the Champaign-Urbana News-Gazette published an article in its

Sunday, October 13, 1985, edition regarding this case. The article was titled, "Trial To Begin In Champaign For Good Samaritan's Murder." The article described the victim as "a woman said to have devoted her life to helping the disabled" and defendant as "a twice-paroled armed robber" and a "recent parolee for armed robbery." The article described the details of the incident. Also, the article in detail described defendant's prior criminal history and referred to his sentence in 1982 to four years in prison for robbery and his later parole violation and reincarceration. The article even referred to defendant's brother who is currently serving a 25-year sentence for murder. The article also contrasted defendant's life with that of the victim.

Two days later, on October 15, 1985, the jury-selection process began and concluded on the following day. The jurors were examined in panels of four and each panel was kept separate from the other prospective jurors. The court examined each prospective juror extensively about his or her qualifications and, most importantly, exposure to pretrial publicity and inadmissible evidence.

This court first notes that both the People and defendant have conflicting counts regarding the exact number of jurors who had or had not read the article. After thoroughly examining the record, this court finds the following. Of the 48 veniremen examined, 20 had never heard or read anything regarding this case. Out of the 20, eight were selected as jurors and one was selected as an alternate juror. Out of the remaining veniremen, 21 had some familiarity with the case because of the October 13 article. One of the 21 was selected as a juror and one was selected as an alternate. Seven veniremen had knowledge of the case from other sources and three of the seven were ultimately selected as jurors.

Of the veniremen who read the article, seven stated that they had formed opinions regarding defendant's guilt and five of the seven were excused for cause because they were unable to set aside those opinions and render a verdict solely on the evidence. The remaining two of the seven veniremen stated that although they had read and might have formed opinions regarding defendant's guilt, they could set aside any knowledge or bias and decide the case solely on the evidence. Two of the 21 who had read the article and who were ultimate jurors could not recall what the article stated.

Seven of the veniremen had been exposed to pretrial publicity from other sources. Five of the seven expressed only a slight recollection of what they had read or heard and claimed not to have any preconceptions regarding the facts or outcome of the case. One of the five was an eventual juror who stated that he had only heard something on the radio but could not recall. Another venireman and eventual juror had the same recollection regarding a television account. A third venireman who was ultimately selected read an article in the News-Gazette in January 1985, but only had a sketchy recollection of that account and had forgotten about it until he heard a television broadcast announcing the commencement of the trial. Another venireman stated that he had read about the case in the newspaper but did not identify the source. Another venireman stated the same but also stated that his opinion would remain unchanged unless there was evidence to prove otherwise, but he later stated he could set aside his bias and give a fair trial to both sides. Another venireman was told about the trial by his wife but nothing further. Another venireman recalled a television announcement in February of 1985 but could not remember anything about it.

Of the veniremen who had read the October 13 article, defense counsel challenged for cause 10 of the

veniremen. However, when the court denied his challenges, defendant excused the veniremen peremptorily. In the circuit court's exhaustive questioning, it revealed that each of the veniremen claimed that they had not formed any opinion. Only one stated that she did form an opinion at the time she read the article but did not have one at that time. At this point of the jury selection, defense counsel exhausted his peremptory challenges before jury selection had concluded, resulting in one venireman being seated despite defense counsel's objections. That venireman stated that he had read the October 13 article and remembered part of it but had not formed an opinion at that time and did not have one at the time of selection. He also stated that he would decide the case solely on the basis of the evidence presented in court and the instructions of law given by the judge.

On appeal, defendant argues that the court erred by denying his challenges for cause. He argues that the article contained highly inflammatory information which affected his right to a fair trial by an impartial jury.

In *Irvin v. Dowd* (1961), 366 U.S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639, the Court held that "[a] fair trial in a fair tribunal is a basic requirement of due process." (366 U.S. at 722, 6 L. Ed. 2d at 755, 81 S. Ct. at 1642.) However,

> "[t]o hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." (366 U.S. at 723, 6 L. Ed. 2d at 756, 81 S. Ct. at 1642-43.)

The test requires this court to examine the record to determine independently whether defendant received a fair

trial. (*People v. Taylor* (1984), 101 Ill. 2d 377, 391.) "In assessing a claim of partiality due to pretrial publicity, a reviewing court has an obligation to evaluate the *voir dire* testimony of the jurors ([*Irvin v. Dowd* (1961),] 366 U.S. 717, 723, 6 L. Ed. 2d 751, 756, 81 St. Ct. 1639, 1643 \*\*\*) \*\*\*." (*People v. Sanchez* (1986), 115 Ill. 2d 238, 263.) In this case, this court finds that "the level of awareness of the case on the part of the venire and the jury ultimately selected was not so great as to establish partiality and to deny defendant a fair trial." (115 Ill. 2d at 263.) In reviewing the record this court also finds that "the degree of publicity was typical for a case of this nature and that awareness on the part of the venire was minimal and did not deny the defendant a fair trial." 115 Ill. 2d at 265.

An analysis of this issue requires this court to discuss other leading cases and to distinguish those cases. This court will show that, although coverage of such a heinous crime is expected, the coverage must be extensive, close in proximity to the trial, and contain prejudicial and inadmissible material which would warrant a change of venue or excusing jurors for cause. However, a defendant cannot expect the press to withhold information regarding cases of great public concern and expect the public to remain ignorant of the case until after the trial.

In *People v. Sanchez* (1986), 115 Ill. 2d 238, this court found that the defendant was not denied a fair trial. This court found the pretrial publicity was not of "unprecedented" intensity. Furthermore, this court noted that only two of the eventual jurors had read of the case in the local newspaper. None of the jurors had an extensive recollection either of what had been reported or of any inadmissible information regarding another murder.

In *People v. Olinger* (1986), 112 Ill. 2d 324, *cert. denied* (1987), 479 U.S. 1101, 95 L. Ed. 2d 520, 107 S. Ct.

1329, this court held that the circuit court did not err in denying the defendant's motion for change of venue although there had been extensive publicity of the case. The publicity was extensive and included prejudicial and inadmissible evidence. This court found that since the defendants had not challenged any of the jurors for cause and that the record did not indicate that any of the jurors had been exposed to the prejudicial and inadmissible publicity, the circuit court properly denied the motion for change of venue.

In *People v. Gendron* (1968), 41 Ill. 2d 351, *cert. denied* (1969), 396 U.S. 889, 24 L. Ed. 2d 164, 90 S. Ct. 179, this court found that the publicity of the case was not so gross and inflammatory as to require a conclusion that the jurors, despite avowals of impartiality, had been prejudiced against the defendants. The coverage of the case consisted of nine front-page newspaper articles during a five-week period following the commission of the crime. One of the defendants was referred to as an ex-convict twice in the article and the other was referred to only once. Another article referred to a parole violation by one of the defendants and another article referred to an attempted jail break by both defendants. The last article appeared six months before the trial and referred to underworld connections of one defendant. Of the 297 prospective jurors, 123 were excused for cause because of prejudice from the publicity. Of the 14 jurors selected including alternates, 13 had read or heard of the case but stated that they had not formed any opinion and would be fair and impartial jurors. This court found that based on the six-month period prior to trial without any publicity, on the examination of the jurors, and on defendant's lack of any challenge for cause, the circuit court did not err when it denied defendant's motion for change of venue.

In light of the above-mentioned cases and this court's examination of the record and article, it finds that defendant was not denied a fair trial by an impartial jury. Nine of the jurors, including one alternate, had never heard of or read anything regarding this case.

One of the four jurors who was exposed to pretrial publicity heard about the case on the morning news but had only heard the end of the announcement and had not formed any opinion. Another juror heard the announcement regarding the trial on a morning television program but did not remember any of it and had not formed an opinion. Another juror had read something about the case in January but did not recall any of it until the October 13 article. He only had a sketchy recollection. The other juror with knowledge of the case from the October 13 article remembered part of it. However, he had not formed any opinion then and did not have one at the time of the selection. Each of the jurors stated that they would decide the case solely on the basis of the evidence presented in court and the instruction of law given by the judge.

Although the article was published within close proximity of the time of the trial, the article did not expose the veniremen to highly prejudicial publicity and inadmissible evidence warranting remandment, especially in light of the fact that 8 of the 12 jurors and one of the alternate jurors had not heard or read anything about the case. Although the article did contain inflammatory words and a prejudicial description of defendant, it did not amount to such "unprecedented" publicity warranting remandment. A case as heinous as this one is of great public interest and is usually extensively reported, but in this case it was not as extensively reported as in the above-mentioned cases. (*Irvin v. Dowd* (1961), 366 U.S. 717, 722-23, 6 L. Ed. 2d 751, 756, 81 S. Ct. 1639, 1642-43.) Defendant cannot expect little or no coverage

of the case and expect all of the jurors to be in total ignorance of the case. Since the circuit court examined each potential juror very extensively regarding any opinions regarding defendant's guilt and the article, this court finds that defendant was not denied a fair trial by an impartial jury. Most significantly, there is no proof that any juror was aware of or remembered any prejudicial material regarding defendant's criminal record.

## III, IV, AND V

In defendant's third, fourth and fifth issues, he argues that he was denied a fair and reliable sentencing hearing because the prosecutor's remarks in his closing argument exceeded his authority. He specifically refers to these segments of the argument:

> (I) "I as state's attorney of my county have taken an oath to uphold the law, and when in my judgment the facts of a case fall within the statutory rules calling for imposition of the death penalty, as Mr. Cudmore has stated to you, it falls upon you to call for the imposition of the death penalty."
>
> (II) "Is it sufficient for society to say to DeWayne Britz: 'For that which you have done, you must now go to prison?' The law in which we all believe says we should do more. *** I submit to you that the memory of that young woman demands that we say more."
>
> (III) "He [Kenneth Imhoff, a State expert witness] found no organic brain damage. Don't you feel or think, ladies or gentlemen, that if this defendant had had this history, two quarts of whiskey a day, all these drugs, all this stuff he says he took, he'd have some kind of organic brain dysfunction? There's no evidence of that."

This court first notes that remarks I and III were not objected to at the hearing and are thereby precluded on review. (*People v. Free* (1983), 94 Ill. 2d 378, 425.) In the post-trial motion, defendant noted that the People made

an emotional plea for the victim in rebuttal and as such the second remark is not waived on review.

In the alternative, defendant argues that the first and third remarks must be considered under the doctrine of plain error, citing *People v. Holman* (1984), 103 Ill. 2d 133, *cert. denied* (1985), 469 U.S. 1220, 84 L. Ed. 2d 347, 105 S. Ct. 1204, and *People v. Szabo* (1983), 94 Ill. 2d 327, *cert. denied* (1987), 479 U.S. 1101, 95 L. Ed. 2d 520, 107 S. Ct. 1330.

In *Holman*, this court found that the prosecutor's remarks were not harmless. Unlike this case, in *Holman* the prosecutor made remarks at great length regarding the possibility that the defendant will kill a prison guard or will escape and kill again. In a very short rebuttal the People pointed out defendant's impoverished background and the victim's accomplishments and family, making an emotional appeal. The prosecutor also made remarks at length misinforming the jury of the circumstances which make the death penalty appropriate. Finally, the prosecutor made numerous and extensive remarks regarding his own personal beliefs concerning the desirability of the death penalty. These are but a few of the improper remarks the prosecutor made at the hearing. This court remanded the case for a new death penalty hearing.

In Szabo, this court found that the prosecutor's remarks in his closing argument at the sentencing hearing were plain error. This court found that the prosecutor's remarks regarding "society's abandonment of capital punishment has been correspondingly accompanied by a dramatic increase in the number of homicides that are being committed" and regarding the possibility of parole were extraneous considerations and were highly inflammatory and prejudicial.

In this case, defendant only alleges that remarks I and III, which were not objected to by counsel, were highly prejudicial. However, the record reveals that each

comment read in context does not inject extraneous inflammatory and prejudicial considerations before the jury. Thus this court does not find that these remarks amounted to plain error.

We also find that the unobjected-to remarks do not fit within the exceptions to the waiver rule. This court will consider such errors where the evidence is closely balanced or where those errors are of such magnitude that commission of them denies the accused a fair and impartial trial. *People v. Carlson* (1980), 79 Ill. 2d 564, 576-77.

Regarding the second remark, defendant cites *Holman*. However, *Holman* is distinguishable. In *Holman*, the prosecutor at length discussed the victim's family. He stated that the victim had a brother who worked for the State and a mother who had "religious moral fiber," and the victim's accomplishments and honors, suggesting that the crime was more heinous. This court held that those remarks distracted the jurors from their task of balancing the aggravating and mitigating factors and instead aroused anger, hate and passion for the defendant and sympathy for the victim's family.

In this case, this court finds that the statements did not mislead the jury and did not appeal to passion and fears or increase the likelihood of the imposition of the death penalty. In context, the remarks by the prosecutor were part of a summary detailing the events of that evening through the eyes of the victim. All of the facts came from evidence which had been admitted at trial. The People did not compare the victim's lifestyle with that of defendant, suggesting the crime was more heinous. The prosecutor stated in full that "the memory of that young woman demands that we say more. The law is there, the facts are there, the right decision is clear and inescapable. That which we have before [us] cries out for the death penalty." The remark does not incite passion, anger, hate or sympathy but reveals a proper

summation of the closing argument. Thus this court finds that the prosecutor's remarks in his closing argument did not deny defendant a fair sentencing hearing.

Defendant in his reply brief cites the recent United States Supreme Court case of *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529, for its argument. However, *Booth* is factually distinguishable from the case at bar.

In *Booth*, the People, as required by Maryland statute, read a presentence report which included a victim impact statement (VIS). The VIS described in detail the personal characteristics of the victim and the emotional impact of the crimes on the family and set forth the family members' opinions and characterizations of the crimes and defendant. The Court held that the introduction of a VIS at the sentencing phase of a capital murder trial violates the eighth amendment.

In this case, the People made a one-time reference to the memory of the victim after a long closing argument. The comment was not a long, detailed description of the impact of the victim's death on the family and did not make comparisons of the victim and defendant. Thus, this court finds that the prosecutor's comment did not deny defendant a fair sentencing hearing.

## VI

Defendant's next issue on appeal is whether or not he was denied a fair sentencing hearing because the death penalty statute violates the eighth and fourteenth amendments of the United States Constitution. He specifically argues that under the statute a defendant may be sentenced to death without the benefit of a presentence investigation report.

Under the death penalty statute, neither the court nor the jury is required to consider a presentence report for the death penalty hearing. (Ill. Rev. Stat. 1985, ch.

38, par. 9—1.) Furthermore, this court has held that a presentence investigation report is not required where the same judge who presided over the trial also presides over the penalty hearing. (*People v. Wright* (1985), 111 Ill. 2d 128, 160; *People v. Madej* (1985), 106 Ill. 2d 201, 211-12.) In *People v. Gaines* (1981), 88 Ill. 2d 342, this court held that although section 5—3—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—3—1) requires a presentence investigation report in all felony cases prior to the imposition of a sentence, it is inapplicable in death penalty hearings. This court stated that chapter 5 of the Unified Code of Corrections deals with sentences other than sentences of death. Thus, whether or not the death penalty hearing is conducted by a judge or jury, a presentence investigation report is not required.

In addition, this court finds that a presentence investigation report would not have provided any new significant mitigating factors. The same jury that sat at defendant's trial also sat at his penalty hearing. At the death penalty hearing, the jury heard about defendant's history of criminality, his physical and mental history, his family situation and background as well as his economic status, education and personal habits. The jury also heard about his unsuccessful attempts at rehabilitation. Since the jury was the same jury at trial, it also had knowledge of all the circumstances of the crime. Most importantly, the jury at the penalty hearing heard testimony from defendant's expert witnesses regarding his mental condition. Thus, this court finds that defendant was not denied a fair sentencing hearing.

## VII

In defendant's next issue, he argues that he was denied a fair and reliable sentencing hearing because the jury signed separate verdict forms based on the im-

proper instructions that defendant's conduct encompassed three separate statutory factors where in fact only one statutory aggravating factor existed. This court finds, however, that defendant has waived the issue on appeal because he did not make any objection to the improper instructions and the verdict forms at the instruction conference or in his post-trial motions. (*People v. Kubat* (1983), 94 Ill. 2d 437, 492; *People v. Foster* (1979), 76 Ill. 2d 365, 380.) This court will only notice those errors which deprive defendant of his constitutional rights and will only correct "grave" errors where there is a factually close case and fundamental fairness requires that the jury be properly instructed. (*Kubat*, 94 Ill. 2d at 492.) Furthermore, the circuit court is under no obligation to give instructions not requested by counsel. It is trial counsel's burden of preparing and presenting jury instructions. (94 Ill. 2d at 486.) In this case, this court does not find in the record that it should refuse to apply the waiver rule. This court does not find any error in the jury instructions in which the interests of justice require otherwise. 107 Ill. 2d R. 451(c).

## VIII

Defendant also argues that the death penalty statute as applied is unconstitutionally arbitrary, capricious and racially discriminatory. Defendant relies on a study conducted by Professor Samuel R. Gross of the Stanford Law School and Professor Robert Mauro of the University of Oregon titled *Patterns of Death: An Analysis of Racial Disparities in Capital Sentencing & Homicide Victimization,* 37 Stan. L. Rev. 27 (1984).

While this case was pending on appeal, the United States Supreme Court handed down a decision regarding the same issue in *McClesky v. Kemp* (1987), 481 U.S. 279, 95 L. Ed. 2d 262, 107 S. Ct. 1756. In *McClesky,* the defendant, a black man, was convicted of two counts of

armed robbery and one count of murder. During the course of the armed robbery of a furniture store, the defendant killed a white police officer. At the penalty hearing, the defendant did not offer any mitigating evidence. The jury recommended that he be sentenced to death on the murder charge. On appeal, the defendant argued that the Georgia capital sentencing process as administered was racially discriminatory in violation of the eighth and fourteenth amendments to the United States Constitution. The defendant relied on the study by Professors David C. Baldus, George Woodworth, and Charles Pulaski titled *Comparative Review of Death Sentences: An Empirical Study of the Georgia Experience*, 74 J. Crim. L. & Criminology 661 (1983) (Baldus study).

Since defendant's arguments are similar to those in the *McClesky* case, this court finds that a more detailed discussion of *McClesky* than that in *People v. Davis* (1987), 119 Ill. 2d 61, is necessary to resolve the issue in this case. In *McClesky*, the defendant argued that "race has infected the administration of Georgia's statute in two ways: persons who murder whites are more likely to be sentenced to death than persons who murder blacks, and black murderers are more likely to be sentenced to death than white murderers." 481 U.S. at 291, 95 L. Ed. 2d at 277-78, 107 S. Ct. at 1766.

The court first found that the Baldus study was different from other statistical studies which the court had accepted as sole proof of discrimination. The court found that each jury is unique in its composition and its decision rests on a multitude of factors that vary according to the defendant and the facts of the case and, as such, "the application of an inference drawn from the general statistics to a specific decision in a trial and sentencing" is not the same as an "inference drawn from general statistics to a specific venire-selection." (481 U.S. at 294-95, 95 L. Ed. 2d at 280, 107 S. Ct. at 1768.) Further-

more, in a venire selection the decision-maker has an opportunity to explain the statistical disparity, but in this case the People had no practical opportunity to rebut the study. Further, the court found that there is one strong fact that cannot be overlooked and that is that the defendant, as in this case, committed an act for which the United States Constitution and the laws of the State permit the imposition of the death penalty.

Regarding *McClesky's* eighth amendment claim, the court concluded that the infliction of death as a punishment for murder is not without justification and as such is not unconstitutionally severe and that the Georgia statute allowing for a bifurcated system allows some jury discretion to be exercised which is controlled by clear and objective standards so as to produce nondiscriminatory application. This court makes the same findings in this case regarding the statute's prescribed administration of the bifurcated hearing for the death penalty. The *McClesky* Court also found that the Georgia system adds an "additional safeguard against arbitrariness and caprice" in the provision allowing for automatic appeal to the State supreme court. (481 U.S. at 303, 95 L. Ed. 2d at 285, 107 S. Ct. at 1772.) The same is true for this case. Another safeguard is that the People cannot preclude any mitigating factors that may form the basis for a sentence less than death. In sum, the Court stated:

"[O]ur decisions since *Furman* [*v. Georgia* (1972), 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726,] have identified a constitutionally permissible range of discretion in imposing the death penalty. First, there is a required threshold below which the death penalty cannot be imposed. In this context, the State must establish rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold. Moreover, a societal consensus that the death penalty is disproportionate to a particular

offense prevents a State from imposing the death penalty for that offense. Second, States cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the penalty. In this respect, the State cannot channel the sentencer's discretion, but must allow it to consider any relevant information offered by the defendant." (481 U.S at 305-06, 95 L. Ed. 2d 2d at 287, 107 S. Ct. at 1774.)

Thus, the Court held that since the death penalty was imposed under the State's sentencing procedures "that focus discretion 'on the particularized nature of the crime and the particularized characteristics of the individual defendant,' " the Court found that the death sentence was not "wantonly and freakishly" imposed. 481 U.S. at 308, 95 L. Ed. 2d at 288, 107 S. Ct. at 1775, quoting *Gregg v. Georgia* (1976), 428 U.S. 153, 207, 49 L. Ed. 2d 859, 893, 96 S. Ct. 2882, 2941.

Regarding the Baldus study, the Court found that "[s]tatistics at most may show only a likelihood that a particular factor entered into some decisions." (481 U.S. at 308, 95 L. Ed. 2d at 289, 107 S. Ct. at 1775.) However, even the author of the Baldus study did "not contend that his statistics *prove* that race enters into any capital sentencing decisions." (Emphasis in original.) (481 U.S. at 308, 95 L. Ed. 2d at 289, 107 S. Ct. at 1775.) The Court found that "[a]t most, the Baldus study indicates a discrepancy that appears to correlate with race." 481 U.S. at 312, 95 L. Ed. 2d at 291, 107 S. Ct. at 1777.

In this case, the statute provides safeguards while preserving the jury's discretion. Defendant cannot argue that a statistical study of objective factors can be a definite indicator of the likelihood he will receive the death penalty. The death penalty statute reflects a significant interplay between the individual characteristics of the case and the individual characteristics of the victim and

the defendant. A statistical study cannot always indicate an absolute probability of the imposition of the death penalty. Although the study analyzes over hundreds of varying factors per case, it relies on but a few of the factors for its conclusions. In this way, the study cannot establish clear patterns of discrimination where such decisions are based on a multitude of factors. Furthermore, defendant in this case fails to prove that the jury acted with a discriminatory purpose. Defendant murdered a woman during the commission of three forcible felonies, for each act the United States Constitution and the laws of Illinois permit the imposition of the death penalty which, as the court stated, is "a legitimate and unchallenged explanation for the decision." (481 U.S. at 297, 95 L. Ed. 2d at 281, 107 S. Ct. at 1769.) Thus, this court finds that defendant has failed to prove intentional discrimination, and, as such, finds that the death penalty statute is not arbitrary, capricious or racially discriminatory.

## IX

In defendant's next issue, he argues that the jury instruction that "[n]either sympathy nor prejudice should influence you" (Illinois Pattern Jury Instructions, Criminal, No. 1.01 (2d ed. 1981) (IPI Criminal 2d) in accordance with IPI Criminal 2d Nos. 7A.10, 7A.14) violates the eighth and fourteenth amendments to the United States Constitution. Recently, the United States Supreme Court in *California v. Brown* (1987), 479 U.S. 538, 93 L. Ed. 2d 934, 107 S. Ct. 837, held that a jury instruction given during the penalty phase of a capital murder trial that instructs jurors that they must not be swayed by "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" did not violate the eighth and fourteenth amendments. (479 U.S. at 540, 93 L. Ed. 2d at 944, 107 S. Ct. at 843.) In this

case, the jury instruction is more simplistic but its intent is the same as in *Brown* and as such this court finds that the jury instruction did not violate the eighth and fourteenth amendments.

Our holding in *People v. Stewart* (1984), 104 Ill. 2d 463, *cert. denied* (1985), 471 U.S. 1120, 86 L. Ed. 2d 267, 105 S. Ct. 2368, is in line with the *Brown* decision. In *Stewart*, this court held that such an instruction stating that "[n]either sympathy nor prejudice should influence you. You should not be influenced by any person's race, color, religion or national ancestry" was proper. (104 Ill. 2d at 493; IPI Criminal 2d No. 1.01(5).) In doing so, this court found that since the jury was instructed that it could consider "any other facts or circumstances that provide reasons for imposing less than the death penalty" and defendant was permitted to introduce all evidence he considered mitigating, defendant's right to a fair hearing was not violated. (*Stewart*, 104 Ill. 2d at 494.) In this case, similar instructions were given and defendant was allowed to present evidence of his alleged drug and alcohol abuse disorder which was inadmissible at trial. Thus, this court finds that defendant was not denied a fair death penalty hearing.

## X

Defendant argues next that the death penalty statute violates the eighth and fourteenth amendments because under sections 104—22 and 104—26 of the Code of Criminal Procedure of 1963 "[a] defendant convicted following a trial under Section 104—22 shall not be subject to the death penalty." (Ill. Rev. Stat. 1985, ch. 38, par. 104—26(b).) Defendant specifically argues that persons who require any special provisions or assistance to be fit for trial such as persons who require "communication by way of sign language, tactile-sense recognition and similar avenues" are exempt from the death penalty. (*People*

*v. Stewart* (1984), 104 Ill. 2d 463, *cert. denied* (1985), 471 U.S. 1120, 86 L. Ed. 2d 267, 105 S. Ct. 2368.) However, those persons who are similarly situated but do not require such assistance are eligible for the death penalty and, as such, are denied equal protection.

Under section 104—10, a defendant is presumed to be fit to stand trial. (Ill. Rev. Stat. 1985, ch. 38, par. 104—10.) If under section 104—10, a defendant, because of his mental or physical condition, is unable to understand the nature and purpose of the proceedings against him or to assist in his defense, he is unfit. Where the defendant's fitness to stand trial is in question, either upon a motion by the defendant or by the People or on the court's own motion, the defendant can have the court determine whether special provisions or assistance render him fit to stand trial. (Ill. Rev. Stat. 1985, ch. 38, par. 104—22.) Under section 104—22:

> "(b) Such special provisions or assistance may include but are not limited to:
>
> (1) Appointment of qualified translators ***.
>
> (2) Appointment of experts qualified to assist a defendant who because of a disability is unable to understand the proceedings or communicate with his or her attorney.
>
> (c) The case may proceed to trial only if the court determines that such provisions or assistance compensate for a defendant's disabilities so as to render the defendant fit as defined in Section 104—10." (Ill. Rev. Stat. 1985, ch. 38, pars. 104—22(b)(1), (b)(2), (c).)

As stated previously, a defendant who is convicted following a trial under section 104—22 shall not be subject to the death penalty. Ill. Rev. Stat. 1985, ch. 38, par. 104—26.

Defendant cites *People v. Stewart* (1984), 104 Ill. 2d 463, *cert. denied* (1985), 471 U.S. 1120, 86 L. Ed. 2d 267, 105 S. Ct. 2368. However, this court finds that defendant has misinterpreted *People v. Stewart*. In

*Stewart* this court addressed the same issue. The defendant argued that sections 104—22 and 104—26(b) unconstitutionally exempt from the application of the death penalty those non-English-speaking defendants who require special provision or assistance in order to be fit to stand trial. After reviewing the legislative history and the legislative debates, this court held that section 104—10 was not intended by the legislature to include merely an inability to speak or understand English. This court stated:

"It surely would be an absurdity to contend, to use an improbable illustration, that the legislature intended that if a foreign legislator, lawyer or professor, were to be convicted of a capital offense, for example, that he could not be considered for the death penalty simply because he did not understand English and required a translator at trial." (104 Ill. 2d at 502.)

In light of *Stewart*, this court finds that section 104—10 *et seq.* does not intend that those defendants requiring special assistance or provisions are exempted from the death penalty. This court notes that its disposition of this issue is in line with its most recent decisions. (*People v. Crews* (1988), 122 Ill. 2d 266, 294; *People v. Enoch* (1988), 122 Ill. 2d 176, 203; *People v. Foster* (1987), 119 Ill. 2d 69, 105.) Moreover, as stated in *People v. Madej* (1985), 106 Ill. 2d 201, 212, this court finds that defendant's argument is "based on a serious misunderstanding" of sections 104—22 and 104—26(b).

## XI

Defendant argues that the death penalty statute is unconstitutional because it does not contain adequate safeguards to prevent arbitrary or capricious imposition of a death sentence. Defendant specifically argues that lack of safeguards "include the manner in which prosecutors may exercise discretion to seek capital punish-

ment, the limited comparative proportionality review which this court undertakes of death sentences, the absence of a requirement limiting evidence of aggravating circumstances to that made known to the defendant prior to trial, the absence of a burden of proof on the prosecution, and the absence of a requirement that capital punishment be found to be appropriate in addition to the computation of whether mitigation outweighed aggravation." Although defendant cites numerous United States Supreme Court cases, he relies on dissenting opinions in these cases which were denied *certiorari* and as such are minority views. This court declines to alter our previous holdings that the death penalty statute contains adequate safeguards. (*People v. Morgan* (1986), 112 Ill. 2d 111, 146-48, *cert. denied* (1987), 479 U.S. 1101, 95 L. Ed. 2d 519, 107 S. Ct. 1329; *People v. Walker* (1985), 109 Ill. 2d 484, 508, *cert. denied* (1986), 475 U.S. 1124, 90 L. Ed. 2d 190, 107 S. Ct. 598.) Thus, this court finds that defendant's argument is without merit.

## XII

Defendant also argues that the Illinois death penalty statute violates due process and equal protection because it fails to adequately narrow its application to a unique and cognizable group of those persons eligible for death from other persons found guilty of murder. In *Zant v. Stephens* (1983), 462 U.S. 862, 77 L. Ed. 2d 235, 103 S. Ct. 2733, the United States Supreme Court dealt with the issue and established a standard in which to review these statutes. The court held:

"To avoid this constitutional flaw, an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." 462 U.S. at 877, 77 L. Ed. 2d at 249-50, 103 S. Ct. at 2742.

Section 9—1(b) lists eight aggravating factors of which at least one must be proved beyond a reasonable doubt to make the defendant "death eligible." As this court elaborated in *People v. Brownell* (1980), 79 Ill. 2d 508, Illinois statutes only recognize one offense of murder. In the indictment or information, the defendant is apprised of the charges against him and from that point he is informed that the death penalty could be imposed. (79 Ill. 2d at 524-25.) The aggravating factors distinguish and narrow the group of persons who are "death eligible." Without these limiting factors, the offense of murder is treated as simple murder qualifying the defendant for a term of imprisonment. Once a defendant is death qualified, the jury or court must weigh aggravating and mitigating factors set forth in section 9—1(c) and determine whether there are no mitigating factors sufficient to preclude the imposition of the death sentence. Once the jury has made its determination that there are no mitigating factors precluding the death penalty, the court shall sentence the defendant to death. (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(c), (g), (h).) If the court or the jury is unable to determine that the defendant should be sentenced to death, then under sections 5—8—1(a)(1) and (b), the court may sentence the defendant to a term of life imprisonment based on the existence of an aggravating factor found pursuant to section 9—1(b). (Ill. Rev. Stat. 1985, ch. 38, pars. 1005—8—1(a)(1), (b).) If the defendant is sentenced to death, the statute provides a further safeguard—a direct and automatic appeal to this court. In light of the procedures provided in the statutes, not only are there narrowing standards regarding the type of defendant to be sentenced to death but also procedures further narrowing the imposition of the death sentence on that unique group of defendants eligible for the death sentence.

This court also finds that defendant's argument that the death penalty statute fails to perform the categorical narrowing function and reasonable justification element of *Zant* is without merit. This court rejected these arguments in the recent case of *People v. Lego* (1987), 116 Ill. 2d 323, and in doing so, stated:

"This argument fails to take into account the unique sentencing procedure afforded those defendants found eligible for the death penalty, the provision for a two-step sentencing process, and the consideration during the second phase of factors introduced as evidence in mitigation and aggravation. This procedure enables the sentencer to independently weigh these factors and, upon determining whether the mitigating factors outweigh the aggravating factors, decide if the death penalty will be imposed. This procedure enables the sentencer to weigh the individual characteristics of the offender and determine his character. [Citation.] Those defendants sentenced under the Unified Code of Corrections are not eligible for this special sentencing treatment." (116 Ill. 2d at 352-53.)

Thus, this court finds that the death penalty statute does not violate due process and equal protection.

## XIII AND XIV

In defendant's last two issues he raises the issues of whether or not the circuit court had jurisdiction to sentence defendant and whether or not the circuit court improperly sentenced him to extended terms on offenses which were not within the most serious class of offense for which he was convicted. The jury found defendant guilty, in addition to murder, of four Class X felonies (two counts of armed robbery and two counts of aggravated criminal sexual assault), one Class I felony (aggravated kidnapping), and two Class III felonies (theft and concealment of a homicidal death). Defendant received extended-term sentences on all of these offenses except

for the armed robbery against Tackett or Tackett Wheels, Inc.

Defendant argues that the trial court lacked jurisdiction to sentence him on the remaining offenses because the notice of appeal filed on November 18, 1985, from the judgment of murder divested the circuit court of jurisdiction. However, the People filed a motion to this court to remand this cause "for the limited purpose of conducting a hearing on the post-trial motion and amendment defendant originally filed in the trial court and to sentence defendant on the seven remaining offenses." This court granted the motion. Thus defendant's argument is moot.

This court also finds that defendant has waived this issue because of his failure to object to the sentence at the first post-trial hearing and the post-trial hearing on remandment. (*People v. Carlson* (1980), 79 Ill. 2d 564, 576.) Defendant also did not object to the sentence in his post-trial motion and the amended post-trial motion.

However, a reviewing court may ignore the waiver rule in order to achieve just results. (*Hux v. Raben* (1967), 38 Ill. 2d 223; 107 Ill. 2d R. 366(a)(5).) Pursuant to Rule 615(a), this court may notice "[p]lain errors or defects affecting substantial rights *** although they were not brought to the attention of the trial court." (107 Ill. 2d R. 615(a).) In this case, the People concede that defendant could not receive extended-term sentences for aggravated kidnapping and concealment of a homicidal death, since they were less serious offenses than the Class X offenses of aggravated criminal sexual assault and armed robbery. The People, however, state that the extended-term sentence for the felony theft of Tackett was proper. These offenses arose out of separate factual incidents involving two different victims. In light of the People's concession, this court, without further discussion, reduces the sentence on the aggravated kid-

napping conviction to a term of 15 years (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(4)) and reduces the sentence on concealment of a homicide death to five years (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(6)).

For the reasons stated herein, the judgment of the circuit court of Champaign County is affirmed. The clerk of this court is directed to enter an order setting Wednesday, September 14, 1988, as the date on which the sentence of death entered in the circuit court of Champaign County is to be implemented. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 119—5). A certified copy of the mandate of this court shall be transmitted by the clerk of this court to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein defendant is confined.

*Judgment affirmed.*

JUSTICE STAMOS took no part in the consideration or decision of this case.