THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GERALD DALL, Defendant-Appellant.

Fourth District   No. 4—90—0120

Opinion filed January 17, 1991.—Rehearing denied February 25, 1991.

510

Michael J. Costello, of Immel, Zelle, Ogren, McClain & Costello, of Springfield, and Arthur J. Inman, of Peoria, for appellant.

Donald M. Cadagin, State's Attorney, of Springfield (Kenneth R. Boyle, Robert J. Biderman, and Denise M. Ambrose, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McCULLOUGH delivered the opinion of the court:

After a jury trial, defendant was convicted of aggravated criminal sexual assault and home invasion. (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(a)(2); Ill. Rev. Stat., 1988 Supp., ch. 38, par. 12—11.) Subsequently, the trial court sentenced defendant to two, concurrent nine-year terms of imprisonment. Defendant appeals, arguing as follows: (1) the trial court erred in denying his motion to suppress physical evidence and statements; (2) he was not found guilty beyond a reasonable doubt; (3) the trial court abused its discretion in restricting cross-examination of the victim; (4) the admission of irrelevant evidence denied him a fair trial; (5) the prosecutor's closing argument was reversible error; (6) the trial court erred in instructing the jury; (7) the trial court erred in denying defendant's motion for a change of venue; (8) a conflict of interest by the State's Attorney's office caused reversible error; and (9) the trial court abused its discretion in sentencing.

We affirm.

### FACTUAL BACKGROUND

L.D., the victim, lived in Springfield on September 18 and 19, 1988. She and defendant, who had been married for nine years, were divorced in August 1988. The court had awarded custody of the parties' only child, E.J., to L.D. However, defendant had filed a motion for reconsideration of that order. E.J. was staying with friends in Peoria during September. L.D. testified that she left the house at approximately 8:30 p.m. on September 18, 1988, and went to meet friends at a neighborhood bar. The light by the side door of the house was on when she left. She stayed at the tavern until 12:30 or 12:45 a.m. on September 19, 1988. While there, she consumed two beers, then switched to a soft drink.

After L.D. drove home, she parked her car in the driveway about six to eight feet from the side door. The light was not working. As she unlocked the entrance and opened the door, someone wearing rubber gloves grabbed her from behind and forced her into the house. A struggle ensued on the landing, where her earrings fell out. Her assailant, whom she recognized as defendant, handcuffed and gagged her with a pair of nylons. Defendant then forced her into the kitchen. While in the kitchen, he talked about the breakup of their marriage and asked about any men she had been dating. After about 10 minutes, defendant put a knife to her throat and said he had come to kill her. Defendant asked whether L.D. would scream. After she shook her head no, he slid the knife under the gag and jerked the knife. The

gag fell free. For the next two to three minutes, defendant asked questions about L.D.'s boyfriends. He then hit her behind the ear, knocking her into a chair and onto the floor. The leg on the chair broke. As L.D. was lying on the floor, defendant played back the messages on her answering machine. She had messages on a tape before going out on September 18, 1988. The next day L.D. did not have any messages on the tape.

After L.D. got up from the floor, defendant removed the handcuffs and forced her into the bedroom. When L.D. refused to remove her clothing, defendant started to undress her and broke her belt. Subsequently, L.D. agreed to undress. After she had undressed, defendant had sexual intercourse with her. Defendant told L.D. to clean up and followed her into the bathroom. She put a robe on, and she and defendant reentered the kitchen, where they smoked a cigarette. L.D. stated she ran toward the door, but defendant caught her. He again threatened to kill her.

After a few minutes, defendant talked about rumors in Clinton that L.D. had left him for another man. He asked her to contact her attorney and have the divorce vacated. Defendant also told L.D. that Herb Pingsterhaus, the Clinton County Republican party chairman, would get her a job if she moved back to Clinton. L.D. stated that after defendant calmed down, she suggested they go out to a restaurant for coffee. Eventually, defendant agreed to go out and get coffee.

Defendant then roamed around the house gathering items and placing them in a green bag. He picked up a police scanner, knife, handcuffs, and pantyhose. L.D. testified defendant became agitated because he could not locate the handcuff keys. Defendant said his car was parked several blocks away. L.D. volunteered to drive defendant to his car, since it was sprinkling. She entered the driver's side of her car and, as defendant was walking around the car, locked the doors. L.D. then drove to a nearby store where she telephoned the police.

L.D. stated she had talked to defendant earlier on September 18, 1988. Defendant left the message on her answering machine at 10:45 a.m. He said it was an emergency concerning her son. She called back at 11 and learned no emergency existed. L.D. ended the conversation. Defendant called back twice, but L.D. did not return his calls. While the divorce was pending, defendant had called L.D. as many as 25 times a day. He sent numerous gifts and letters. L.D. did not ask defendant to come to Springfield on September 18, 1988. She did not consent to sexual intercourse on September 19, 1988, and had not given defendant authority to enter her house. During their nine-year marriage, she and defendant never engaged in bondage.

L.D. stated she sustained several cuts and bruises, marks on her wrists, and a cut lip as a result of the incident.

On cross-examination, L.D. stated she and defendant had reconciled after separating in 1985. She had never seen defendant carry a bag while they were married. He often wore a police scanner clipped to his belt. L.D. stated defendant usually appeared nervous as his hands shook. L.D. admitted her ears and her genital area were not injured. In her written statement, she did not mention the gloves.

Steven Lindsey, an employee of the White Hen Pantry, stated L.D. entered his store at approximately 2:15 a.m. on September 19, 1988. She asked to use the telephone. Her eyes were watering, she could barely talk, and she said she had been raped.

Kathy and Larry Whieties testified they met with L.D. at a tavern at 8:30 p.m. on September 18, 1988. She did not have any bruises at that time. They left at 12:30 a.m. on September 19, 1988. L.D. had consumed two or three beers.

Springfield police officer Bruce Alderson testified he met L.D. at the White Hen Pantry at 2:27 a.m. on September 19, 1988. Her clothes were neat, she had red watery eyes, she was very nervous, and she had a lump on her head. Alderson noted L.D.'s wrists were red and sore. L.D. reported she had been raped. Alderson stated the marks on her wrists looked as if they were caused by someone struggling against handcuffs. L.D. did not tell Alderson defendant had a knife.

Springfield police officer Keith Ushman stated that at approximately 2:27 a.m. on September 19, 1988, he was investigating a possible burglary at Sixth and Black Streets in Springfield. He saw defendant, who was carrying a green bag, running south on Fifth Street. Ushman told defendant to stop and asked why he was running. Defendant stated he did not want to get wet. Ushman thought this was an unusual answer since he had been out in the mist for a long time and was not wet. Ushman stated defendant appeared quite nervous and was sweating profusely. Ushman asked defendant for some identification and defendant told him he did not have any. Ushman then asked why defendant was carrying the bag. Defendant told him he had valuable personal possessions in it which he did not want stolen from his vehicle.

Ushman stated defendant consented to a search of the bag. Defendant, in the hearing on his motion to suppress, stated that to the best of his knowledge, he did not consent to a search of the bag. At trial, defendant stated he consented to a search of the green bag. Ushman unzipped the bag and observed a police scanner tuned to the

Springfield police department channel. It was common practice for burglars to carry police scanners. After observing the scanner, Ushman asked defendant where his identification was located and escorted defendant back to his vehicle. Defendant retrieved his license from the vehicle. While they were waiting for a license check, defendant stated he and his wife had had a fight. Ushman looked in the green bag again and saw a knife, rubber gloves, nylons, a note, handcuffs, and the scanner.

Springfield police officer Jeffrey Bivens assisted Ushman. Bivens told defendant the police would detain him until they could check on the welfare of L.D. Defendant said she would either be getting coffee or talking to the police. After the dispatcher stated L.D. was making a complaint, Bivens searched defendant and placed him in the squad car. Officer William Neale advised defendant of his *Miranda* rights.

Neale stated defendant told him L.D. asked defendant to come to her house on September 18, 1988. They had consensual sexual intercourse. He accidentally picked up her nylons with the scanner. He brought the scanner because he would be able to hear if L.D. called the police and leave before they arrived. Subsequently, defendant talked to Neale and Detective Joe Goulet. He stated L.D. had called him and arranged to meet with him at the Springfield College parking lot on September 18, 1988. She did not appear at the lot so he drove to her house. Later, he drove back to the lot, parked, and walked to the house. L.D. arrived between 11:30 p.m. and 12:30 a.m. They engaged in consensual sexual intercourse and did not engage in any kind of bondage. Neale further testified L.D. told him that defendant had plastic gloves on when he entered the house.

Springfield police officer Tom Cocayne investigated L.D.'s house. He found a pair of women's earrings on the landing adjacent to the side door. He observed a kitchen chair with a broken leg and noted that a portion of a broken belt was next to the chair. The rest of the belt was on the bedroom floor. The bed was made but messed up.

Springfield police officer John Adelman's testimony corroborated Cocayne's testimony. Adelman stated the kitchen telephone had been disconnected.

William Frank, a forensic serologist, testified seminal material found on L.D.'s panties, a towel, and in the vaginal swab could be from defendant. Hairs found on the knot in the nylons had been forcibly removed and were consistent with L.D.'s hair samples. The ends of the nylons had been cut. Stains from an enzyme predominantly found in saliva were on the pantyhose. The stains could have come from the victim.

Goulet investigated the assault report. Defendant told Goulet L.D. had called him twice the previous weekend to set up a visit. Defendant set up a meeting for 10 p.m. at a parking lot. L.D. was not there so, after waiting 15 minutes, defendant drove to her home. She was not at home so defendant drove back to the lot, left his vehicle, and walked to L.D.'s house. L.D. arrived between 11:30 p.m. and 12:30 a.m. She invited him inside, where they talked for about 1½ hours. They then engaged in consensual intercourse. Defendant told Goulet no bondage occurred. L.D. had not asked to be gagged, and he had not gagged her. He did not handcuff her.

Goulet also interviewed L.D. L.D. told him defendant had cut the nylons off with a knife. She did not say the knife was used to threaten her. She told Goulet that defendant had caught her as she ran toward the door and threatened to kill her again. In Goulet's opinion, the marks on L.D.'s arms and wrists were consistent with those caused by a person struggling against handcuffs.

Over defendant's objection, a note found in the green bag was admitted into evidence. The note said:

"Entrance
Telephone
Questions
Boyfriends
Lawyer
Rumor
Job-summer-Herb
Letters
Mom + me
Cleanup
Exit
Herb"

The green bag and its contents were also admitted.

Defendant testified in his own behalf. He lived in Carlyle, Illinois, and was the sheriff of Clinton County. He had been elected to the sheriff's office for six terms. He started as a deputy sheriff in 1959. In his opinion, the handcuffs could not have caused the marks on L.D.'s wrists and arms. Defendant stated he had a hereditary medical condition which caused his hands to shake and affected his close body control.

He and L.D. married in 1979. They had one child, E.J., who was eight at the time of the trial. In 1985, he and L.D. separated for 10½ months before reconciling. L.D. filed a dissolution of marriage action in March 1987. She left the marital home in November 1987. Between

March and November, he and L.D. continued to engage in sexual intercourse. L.D. left E.J. with defendant when she moved. In August 1988, the divorce became final. Defendant stated the divorce and custody battle were extremely bitter. Both parties wanted E.J. In August 1985, he filed a motion to reconsider the custody order. He called L.D. frequently because he loved her and wished to reconcile the marriage. He and L.D. engaged in sexual relations after November 1987.

Defendant stated he called L.D. first on September 18, 1988; then, she returned his call. They agreed to meet in the Springfield College parking lot because L.D. did not want her family to know she was meeting defendant. Defendant did not want to leave his equipment in the car because it could be burglarized. L.D. did not meet defendant at the lot, so he drove by her house and her parents' house. He then drove back to L.D.'s house and, subsequently, returned to the parking lot. At 11:15 to 11:20 p.m., he walked over to L.D.'s house. It was drizzling rain at that time. L.D. arrived immediately after midnight. He told her she was late, and she responded that she had stopped for drinks with friends. Defendant further stated he held L.D.'s purse while she unlocked the door. When she pushed open the door, she dropped items which she was holding in her hand. He helped her pick up the items off of the floor.

Defendant admitted he was carrying a green duffle bag. He did not want the equipment, which he used in his position as sheriff, to litter his vehicle. Previously, he had kept the equipment in his patrol car, but when he got a new car, he needed to keep the items in the bag to keep them organized. The note had been in the bag since the spring of 1988. Defendant then provided an explanation of the words listed on the note. He stated that "entrance" referred to a guardrail that he needed to place around a wheelchair lift so the county could qualify for self-insurance. "Telephone" referred to a new telephone system which had been installed in the courthouse. Defendant did not remember what "questions" referred to. "Boyfriends" referred to his oldest daughter's boyfriends, of whom he did not approve. "Lawyer" referred to his divorce lawyer. "Jobs-summer-Herb" referred to jobs the Republican county chairman had procured for high school students. "Letters—Mom + me" refer to his one-third interest in real estate. "Clean up" referred to prison inmates which he had used to clean areas in the county during the summer. It was to remind him to send a thank you note. "Exit" referred to exit signs needed for the self-insurance program. "Rumors" referred to rumors about a deputy who was cohabiting with someone in the county.

Defendant denied wearing rubber gloves on September 18 or 19,

1988. He did not place a knife to L.D.'s throat or cut a gag of panty-hose. Defendant carried a scanner with him to L.D.'s house because she had called the police to report him being there a few weeks before. He took the bag to protect the scanner from the rain.

After L.D. invited him into her house on September 19, 1988, they discussed reconciliation. They engaged in consensual intercourse. Defendant had been wearing the handcuffs clipped to his belt. When he undressed, he left the handcuffs on a chair. After he had dressed, defendant playfully cuffed L.D.'s hands and said he would take her home now instead of waiting. The nylons were on the end table in the living room. He accidentally picked them up when he gathered his other items. Defendant denied gagging L.D., handcuffing her behind her back or hitting her. Defendant stated he and L.D. were in good spirits when they left the house.

After L.D. locked him out of her vehicle, he started walking back to his car. He did not recall telling the police he was nervous because he had had a fight with his wife. Defendant did not believe he told police officers that he and L.D. were to meet at her house. He still loved L.D. and begged her to reconcile with him.

On cross-examination, defendant stated that at one time L.D. had sought an order of protection.

In rebuttal, Eric Rhein, L.D.'s attorney in the custody action, stated the criminal matter concerning defendant and L.D. was not raised in the custody dispute.

L.D. denied engaging in consensual sexual intercourse with defendant after she had left the marital home.

ANALYSIS

SUPPRESSION MOTION

Defendant filed motions to suppress the items found in the green bag and statements made by him thereafter. He based his trial motions on fourth and fifth amendment grounds. (U.S. Const., amends. IV, V.) On appeal, defendant argues the court erred in denying his motions as Ushman did not have a reasonable suspicion that he was involved in criminal activity at the time Ushman initiated a *Terry* stop. Defendant argues his statements that he was nervous because he had fought with his wife and she was either getting coffee or calling the police were results of the illegal detention and should be suppressed. Finally, he contends he did not consent to a search of the green bag and, if he did consent, his consent was coerced.

The State responds that this was a chance encounter between

Ushman and defendant, which did not implicate the fourth amendment. Alternatively, the State argues Ushman had a reasonable suspicion that defendant was engaged in criminal activity when he stopped him. The fourth amendment provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." (U.S. Const., amend. IV.) In *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868, the Supreme Court noted the fourth amendment provides security from unreasonable searches and seizures. However, when a police officer has a reasonable suspicion, based on articulable facts, that a citizen is engaged, has engaged, or is about to engage in criminal activity, the officer may stop and question the person. If he reasonably fears for his own safety or the safety of another, he may conduct a limited search for weapons.

■ However, not all encounters between citizens and law enforcement officers implicate the fourth amendment. (*Florida v. Royer* (1983), 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319; *United States v. Mendenhall* (1980), 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870.) Although consensual questioning does not implicate the fourth amendment (*Royer*, 460 U.S. at 497-98, 75 L. Ed. 2d at 236, 103 S. Ct. at 1324), a seizure of the person would implicate the fourth amendment. A seizure occurs when a law enforcement officer restrains the citizen's liberty by force or by a show of authority. *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877.

■ Section 107—14 of the Code of Criminal Procedure of 1963 also provides a police officer may stop a person in a public place when from the circumstances he reasonably infers that criminal activity is occurring. The officer may ask for the individual's name, address, and an explanation of his actions. (Ill. Rev. Stat. 1987, ch. 38, par. 107—14.) The statute codifies *Terry*. *People v. Lee* (1971), 48 Ill. 2d 272, 269 N.E.2d 488.

An objective standard is used in determining the reasonableness of the stop. (*People v. Tribett* (1981), 98 Ill. App. 3d 663, 424 N.E.2d 688.) A trial court's findings on a motion to suppress will not be reversed unless the findings are manifestly erroneous. *People v. Jones* (1989), 190 Ill. App. 3d 416, 545 N.E.2d 1332.

■ Here, Ushman yelled at defendant and ordered him to stop. He then approached and asked defendant questions. In *Mendenhall*, the Supreme Court noted language or tone of voice indicating that compliance is required is a factor which indicates a seizure of the person has occurred. (*Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877.) A seizure of defendant occurred when Ushman

ordered him to stop. However, the trial court's determination that the stop was justified under *Terry* and the Code of Criminal Procedure of 1963 is supported by the evidence. It was after 2 a.m. Defendant was running faster than a jog in an area where Ushman was investigating a burglary. He was carrying a duffle bag. These factors justify Ushman's initial questioning of defendant. Ill. Rev. Stat. 1987, ch. 38, par. 107—14.

According to Ushman, defendant did not have an identification, appeared very nervous, and was sweating profusely. Defendant provided an explanation for running which Ushman believed was suspicious. Finally, although defendant was ambivalent about whether he consented to a search of the bag during the hearing on his motion to suppress, at trial defendant stated he gave Ushman consent to look in the bag. Ushman's testimony was consistent with consent. After Ushman observed the police scanner, which he knew was commonly used by burglars in the Springfield area, he was justified in holding defendant to investigate further. The trial court correctly denied defendant's motion to suppress.

### REASONABLE DOUBT

■ Defendant next argues he was not proved guilty beyond a reasonable doubt of aggravated criminal sexual assault because L.D.'s testimony was not clear and convincing or substantially corroborated. He contends the jury erred in finding L.D. more credible. This court has recently abandoned the "clear and convincing or substantially corroborated" standard in viewing the sufficiency of evidence in a sex offense case. (*People v. Roy* (1990), 201 Ill. App. 3d 166, 558 N.E.2d 1208, *appeal denied* (1991), 136 Ill. 2d 552; *People v. James* (1990), 200 Ill. App. 3d 380, 558 N.E.2d 732, *appeal denied* (1990), 135 Ill. 2d 562; *People v. Cole* (1990), 193 Ill. App. 3d 990, 550 N.E.2d 723 (Steigmann, J., specially concurring).) The appropriate standard of review is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) A reviewing court will not overturn a jury's credibility determination. *Collins*, 106 Ill. 2d 237, 478 N.E.2d 267.

■ Here, a credibility question was posed to the jury. Additionally, L.D.'s testimony that she had not consented to sexual intercourse was supported by the evidence of her physical injuries, testimony that the handcuffs had injured her wrists, evidence that the pantyhose had

been used as a gag and cut, and indications that a struggle had occurred at the residence. Items found on defendant's person also supported the inference that he had engaged in criminal activity. The evidence was sufficient to sustain the conviction.

■■ Defendant next argues he was not proved guilty beyond a reasonable doubt of home invasion. (Ill. Rev. Stat., 1988 Supp., ch. 38, par. 12—11.) Defendant contends that since L.D. was entering an empty house at the time defendant attacked her and forced her into the house, no one was "physically present" in the house at the time of the invasion. Section 12—11 of the Criminal Code of 1961 provides:

> "(a) A person who is not a peace officer acting in the line of duty commits home invasion when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present or he or she knowingly enters the dwelling place of another and remains in such dwelling place until he or she knows or has reason to know that one or more persons is present and
>
> (1) While armed with a dangerous weapon uses force or threatens the imminent use of force upon any person or persons within such dwelling place whether or not injury occurs, or
>
> (2) Intentionally causes any injury to any person or persons within such dwelling place." Ill. Rev. Stat., 1988 Supp., ch. 38, par. 12—11(a).

Defendant relies on *People v. Pettit* (1984), 101 Ill. 2d 309, 461 N.E.2d 991. However, *Pettit* is distinguishable. Pettit's conviction for home invasion was reversed on appeal. Pettit and two others had invaded the first floor of a house which had been divided into two apartments. The residents of the upstairs apartment were baby-sitting for the downstairs residents. All of the evidence indicated Pettit and the other defendants were unaware of the fact that the house had been divided into two apartments. After waiting for the first-floor apartment dwellers to return, Pettit took his hostages upstairs. He was charged with home invasion of the second-floor apartment. The supreme court affirmed reversal of the convictions, noting that no evidence indicated Pettit knew he was entering the "dwelling of another" when he went upstairs.

■■ Here, L.D. had unlocked both the locks on her side door and started to open it when defendant accosted her. Forcing a person into her own home and following that person into the home without authority satisfies the portion of the home invasion statute, that defendant, without authority, enters the dwelling place of another knowing

524

that one or more persons are present. The evidence, thus, supports a finding that defendant, who watched L.D. start to enter, knew she was home.

CROSS-EXAMINATION

Defendant next argues the trial court abused its discretion in restricting cross-examination of L.D. to show bias. Defendant wanted to introduce evidence that L.D. had been accused of sexually assaulting E.J. The trial court granted the State's motion *in limine* to preclude introduction of this evidence.

■■ ■ The confrontation clause of the sixth amendment (U.S. Const., amend. VI) guarantees a defendant the right to cross-examine a witness against him for the purpose of showing the witness' motive to testify falsely, bias, or interest. (*Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105.) However, the sixth amendment does not prevent the trial judge from imposing limits on defense counsel's inquiry. (*People v. Harris* (1988), 123 Ill. 2d 113, 526 N.E.2d 335.) A trial judge retains wide latitude in imposing reasonable limits on cross-examination based on concerns of harassment, prejudice, confusion of issues, witness safety, or repetitive interrogation. (*Harris*, 123 Ill. 2d at 144, 526 N.E.2d at 348.) The relevant inquiry on review is whether the limitation created a substantial danger of prejudice by depriving defendant of the ability to test the truth of the witness' direct testimony. (*Harris*, 123 Ill. 2d at 145, 526 N.E.2d at 348.) The trial court will only be overturned upon a showing of a clear abuse of discretion which prejudiced the defendant. *People v. Roy* (1988), 172 Ill. App. 3d 16, 526 N.E.2d 204, *cert. denied* (1989), 490 U.S. 1094 104 L. Ed. 2d 997, 109 S. Ct. 2441.

Extensive evidence was introduced during pretrial motion hearings on the admissibility of the allegation of sex abuse. That evidence indicates defendant had been found in contempt of court for making unfounded allegations that E.J. had been abused by L.D.'s son by a prior marriage. His divorce attorney had been censured by the Clinton County court for lying in a pleading. Defendant then took E.J. to a psychologist. The psychologist in an affidavit and in deposition stated he believed defendant prompted E.J. to accuse his stepbrother of molestation. However, after several sessions, the psychologist believed E.J. had been abused by someone. The psychologist stated that either defendant or L.D. could have abused E.J. It was also possible that E.J. had learned how to create a believable allegation of sexual abuse. E.J. wanted to stay with his father. Defendant filed a motion for reconsideration of custody, alleging L.D. had sexually abused E.J.

We note that subsequently an investigation by the Department of Children and Family Services (DCFS) found this allegation was unfounded.

The trial judge stated in ruling on the motion *in limine* that defendant could bring out that a custody dispute was ongoing and bitter. Defendant could also establish that he had filed a motion for reconsideration of custody. However, a minicustody battle would not occur in the criminal trial.

■■ No abuse of discretion occurred from this ruling. Had defendant been allowed to examine L.D. about the sexual abuse allegation, the State could have brought forth information concerning prior allegations and the entirety of the psychologist's opinion in an effort to rehabilitate L.D.'s credibility. Generally, when cross-examination of a witness develops that the witness is biased, the offering party is entitled to rehabilitate the witness. (*People v. Burke* (1964), 52 Ill. App. 2d 159, 201 N.E.2d 636.) This testimony would have caused a confusion of the issues in the instant case. It also would have been unduly harassing since the allegation of sexual abuse in the instant case against L.D., due to the past circumstances, was not reliable.

Additionally, L.D.'s divorce attorney testified the criminal matter was not used by L.D. in the custody proceedings. We note that had all of the information concerning the allegations of sexual abuse been brought forth, defendant could have been harmed rather than aided. He was allowed to develop his defense that L.D. was lying due to the fact that she wished to maintain custody of the child. The trial court properly exercised its discretion in limiting questioning concerning allegations of sexual abuse.

## EVIDENTIARY ERRORS

■■ Defendant next argues the trial court erred in admitting evidence (1) that L.D. had sought an order of protection; (2) that he had threatened to kill L.D.; (3) that L.D. did not use the pending criminal matter during the hearings on defendant's motion for reconsideration of custody; and (4) of the note found in the duffle bag. Defendant contends the evidence was irrelevant. He also contends the order of protection and threat indicate he committed an uncharged offense. Evidence is relevant when it tends to make the existence or nonexistence of a fact of consequence more or less probable. (*People v. Johnson* (1986), 114 Ill. 2d 170, 499 N.E.2d 1355; *People v. Free* (1983), 94 Ill. 2d 378, 447 N.E.2d 218.) Physical evidence is generally admissible if it is tied to defendant and the crime. *Free*, 94 Ill. 2d 378, 447 N.E.2d 218.

Defendant made a motion *in limine* seeking to prohibit admission of evidence that he had violated an order of protection. The pretrial judge found the order of protection was invalid. She, therefore, allowed the motion. Prior to trial, the prosecution filed a motion seeking to use the fact that L.D. had sought an order of protection as relevant to defendant's authority to enter the home. Over defendant's objection, the court stated that it would allow only the question concerning whether L.D. had sought an order of protection.

The prosecution did not introduce evidence of the order of protection in its case in chief. Defendant, during his testimony, stressed that he was trying to reconcile with L.D. He noted that L.D. would often invite him and E.J. to go on outings; then, she would call the police when he arrived. This was the reason defendant gave for carrying the police scanner. Defendant also testified that September 18, 1988, L.D. had invited him to her home. On cross-examination, defendant admitted L.D. had sought an order of protection. The fact that L.D. had sought an order of protection was relevant as rebutting defendant's contention that she invited him to the house. It also served to discredit defendant's testimony. The order of protection was relevant.

The threats defendant made while in L.D.'s house were also relevant. They made more probable L.D.'s testimony that she did not consent to intercourse. Additionally, the fact that defendant threatened to kill L.D. was relevant to the use of force in the commission of the aggravated sexual assault and tended to establish that his entry into the home was not authorized.

Defendant contends the order of protection and threat were evidence of uncharged offenses. Defendant argues this evidence was highly prejudicial. Evidence of crimes for which the defendant is not on trial is not admissible if relevant merely to show defendant's propensity to commit crime. (*People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238.) However, evidence of other offenses is admissible if it is relevant for any purpose other than to show the propensity to commit crime. *People v. Phillips* (1989), 127 Ill. 2d 499, 538 N.E.2d 500.

The fact that L.D. sought an order of protection does not indicate defendant committed a crime. The statement did not indicate the court had issued the order nor did it indicate defendant had violated it. Defendant's threat to kill L.D. may indicate an uncharged offense. However, it is relevant to show the lack of consent to sexual intercourse and indicates defendant's intent was to harm his victim. Evidence tending to show intent or motive is admissible even though it implicates defendant in an uncharged offense. *Phillips*, 127 Ill. 2d 499, 538 N.E.2d 500.

The rebuttal testimony from Eric Rhein, L.D.'s attorney in the

custody case, was relevant. Defendant's defense was that the charge had been fabricated to gain an advantage in the custody action. Rhein's testimony that L.D. had not introduced the criminal charges in the custody proceedings tended to make the fabrication defense less credible. It was, therefore, relevant.

■■ Finally, defendant argues the note found in his green bag was irrelevant because it was written in the spring of 1988 and defendant had an innocent explanation for the references within it. The list corresponded exactly to the order of events which occurred at L.D.'s home. Ushman found the note in the duffle bag which defendant was carrying the night he was arrested. Physical evidence is relevant if connected to the defendant and the offense. (*Free*, 94 Ill. 2d 378, 447 N.E.2d 218.) The relevancy of the note is not diminished by defendant's innocent explanation of its contents.

## CLOSING ARGUMENT

■■ Defendant argues the prosecutor's closing argument was prejudicial error because it diminished the presumption of innocence. Defendant did not raise this issue in his post-trial motion. He has, therefore, waived review of the question. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.) On the merits, no error occurred. The prosecutor may state his conclusion that defendant or a defense witness is lying, if the statement is based upon the evidence or a reasonable inference from it. (*People v. Tiller* (1982), 94 Ill. 2d 303, 447 N.E.2d 174; *People v. Jones* (1987), 155 Ill. App. 3d 641, 508 N.E.2d 357.) Here, the prosecutor stated either defendant or L.D. was lying, the jury had to decide a credibility question and, in his opinion, defendant had the better motive to lie. The presumption of innocence was not diminished by this argument.

## INSTRUCTIONS

■■ Defendant next argues the trial court erred in denying his issues instruction on home invasion. Defendant's instruction is not a part of the record on appeal. Therefore, we cannot review the propriety of denying the instruction. Defendant has waived this issue. *People v. Leonard* (1988), 171 Ill. App. 3d 380, 526 N.E.2d 397.

■■ Defendant next argues giving the circumstantial evidence instruction constituted reversible error. Defendant contends all the evidence in the case was direct evidence. Therefore, the instruction allowed the jury to speculate on matters not in evidence. Circumstantial evidence is proof of certain facts from which the jury may infer other con-

nected facts, which usually follow from the established fact. (*People v. Rhodes* (1981), 85 Ill. 2d 241, 422 N.E.2d 605.) Several items of evidence in the instant case were circumstantial in nature. Therefore, giving the instruction was not error.

■■■ During deliberations, the jurors sent a question to the court. They asked whether any police reports supported L.D.'s testimony that her porch light was out and had been loosened in its socket. Defendant argues this indicates the jury was confused by the circumstantial evidence instruction. On the contrary, we find the question indicates the jury was considering an item of circumstantial evidence which could indicate an unauthorized entry into the home. No error occurred in instructing the jury.

### PLACE OF TRIAL

Defendant next argues the trial court erred in failing to change the place of trial. Defendant contends media coverage made it impossible to obtain an impartial jury. On April 18, 1989, defendant filed a motion to change the place of trial due to newspaper publicity. Attached to the motion was a copy of an April 13, 1989, newspaper article. The article noted defendant, who was awaiting trial for the instant offenses, had been arrested for harassing L.D. On August 3, 1989, defendant filed a second motion for a change of venue. This motion alleged extensive media coverage necessitated a change in the place of trial.

Defendant attached computer-generated copies of 11 articles from the State-Journal Register to this motion. None of the articles had run on the front page. Generally, they reported the incident, defendant's subsequent arrest for violations of the order of protection, contempt findings in the dissolution matter, and the progress of the lawsuit. Two articles dealt with Clinton County officials' reactions to the case and defendant's resignation as sheriff. The trial court denied the motion but stated defendant could renew it if the jury selection process indicated an inability to obtain an untainted jury.

Jury selection occurred on November 27, 1989. Twenty-seven potential jurors were examined prior to selection of 12 panel members and 2 alternates. The alternates did not sit on the jury. Five of the twelve jurors had heard or read something about the case before trial. Juror Jack Bricker stated he vaguely remembered seeing something in the paper about the case. However, he could not recall any details, and the article would not influence him. Fannie Heninger stated she had read about the case in the paper. However, the articles would not influence her. Gretchen Leming stated she heard a little about the case on the news the night before jury selection. She had also heard a radio report on the

case. However, nothing she had heard would influence her decision. Jurors Merwyn Nelson and Janice Rutledge stated they had read about the case in the paper. However, both jurors said the articles would not influence their decision. Defense counsel utilized 7 out of his 10 peremptory challenges. He did not renew his motion for a change of venue prior to trial or during the jury selection process.

In *Irvin v. Dowd* (1961), 366 U.S. 717, 722, 6 L. Ed. 2d 751, 755, 81 S. Ct. 1639, 1642, the Supreme Court, quoting *In re Murchison* (1955), 349 U.S. 133, 136, 99 L. Ed. 942, 946, 75 S. Ct. 623, 625, held that " '[a] fair trial in a fair tribunal is a basic requirement of due process.' " However, the *Irvin* court also held that jurors need not be totally unaware of a case for a defendant to receive a fair trial. The *Irvin* court stated: "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." (*Irvin*, 366 U.S. at 723, 6 L. Ed. 2d at 756, 81 S. Ct. at 1643; see also *People v. Britz* (1988), 123 Ill. 2d 446, 528 N.E.2d 703.) Determining whether defendant received a fair trial by an impartial jury necessitates an independent examination of the record. (*People v. Taylor* (1984), 101 Ill. 2d 377, 391, 462 N.E.2d 478, 484.) The reviewing court must evaluate the *voir dire* of the jurors. (*Britz*, 123 Ill. 2d 446, 528 N.E.2d 703; *People v. Sanchez* (1986), 115 Ill. 2d 238, 503 N.E.2d 277.) The record as a whole must establish more than a potential for bias. (*Taylor*, 101 Ill. 2d 377, 462 N.E.2d 478.) The court may also consider that defendant did not exhaust his peremptory challenges. Although this factor is not conclusive, it rebuts an allegation of bias. *Sanchez*, 115 Ill. 2d 238, 503 N.E.2d 277.

Based upon our review of the record, the jury *voir dire*, and the articles, we conclude the level of awareness of the case by the jurors did not deny defendant a fair trial. None of the jurors recalled specific details of the case. All said they could decide based upon the evidence at trial. Additionally, the articles were not as extensive or prejudicial as those appearing in other cases. See *Taylor*, 101 Ill. 2d 377, 462 N.E.2d 478.

No error occurred in denying the motion for a change in venue.

## Conflict Of Interest

Defendant next argues that a potential conflict of interest existed between L.D. and the State's Attorney's office which denied him a fair trial. Defendant contends that if the sexual abuse allegations against L.D. had been true, the State's Attorney would have had to prosecute its own witness. He maintains this conflict would have caused the State's Attorney to protect L.D.'s reputation. A representative of

DCFS testified during the hearing on defendant's post-trial motion. She and a Springfield police officer investigated the sexual abuse allegation against L.D. She and the officer concluded the allegation was unfounded and not credible. Section 6 of "An Act in regard to attorneys general" provides when a State's Attorney is "interested" in any cause or proceeding which he will prosecute, the court may appoint a special prosecutor. (Ill. Rev. Stat. 1989, ch. 14, par. 6.) A prosecutor is "interested" for purposes of the statute if he is interested as a private individual or his office is a party to the action. (*Baxter v. Peterlin* (1987), 156 Ill. App. 3d 564, 509 N.E.2d 156.) Performance of one's official functions will not create a conflict of interest. See generally *Environmental Protection Agency v. Pollution Control Board* (1977), 69 Ill. 2d 394, 372 N.E.2d 50.

In the instant case, the sexual abuse allegations had been determined to be unfounded. Even if the allegations were credible, the State's Attorney would not have been presented with a legal conflict of interest. He would not have been personally interested in the matter. The State's Attorney's office would be carrying out its official duties in pursuing any action against L.D. We note also that defendant did not file a motion for a special prosecutor based upon any conflict of interest. The issue, on appeal, has little merit.

## SENTENCING

Defendant argues the trial court abused its discretion in sentencing him to two concurrent terms of nine years' imprisonment. Defendant contends the trial court failed to give adequate consideration to his lack of a prior criminal record and rehabilitative potential. A reviewing court will not overturn a trial court's sentencing determination unless there is an abuse of discretion. (*People v. Almo* (1985), 108 Ill. 2d 54, 483 N.E.2d 203.) The trial court is in the best position to assess the various matters which influence a sentencing determination. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) Contrary to defendant's assertions, the record shows the sentencing court carefully considered his past, his potential for rehabilitation, and the nature of the offenses. We cannot say the court abused its discretion in sentencing. Therefore, we affirm the trial court.

Affirmed.

LUND, P.J., and GREEN, J., concur.